Sheehan & Associates, P.C.
Spencer Sheehan
505 Northern Blvd Ste 311
Great Neck NY 11021-5101
Telephone: (516) 303-0552
Fax: (516) 234-7800
*spencer@spencersheehan.com*

Reese LLP
Michael R. Reese
100 W 93rd St Fl 16
New York NY 10025-7524
Telephone: (212) 643-0500
Fax: (212) 253-4272
*mreese@reesellp.com*

United States District Court
Southern District of New York                                        1:20-cv-01764

| | |
|---|---|
| Maritza Angeles, individually and on behalf of all others similarly situated, | |
| Plaintiff, | |
| - against - | Class Action Complaint |
| Tillamook County Creamery Association, | |
| Defendant | |

Plaintiff by attorneys alleges upon information and belief, except for allegations pertaining to plaintiff, which are based on personal knowledge:

1.      Tillamook County Creamery Association ("defendant") manufactures, distributes, markets, labels and sells yogurt products purporting to be flavored only with vanilla under their Tillamook brand ("Products").

2.      The Products are available to consumers from retail and online stores of third-parties and are sold in containers of 5.3 OZ and 24 OZ.

3.      The Products' front label representations include the brand, "Lowfat Greek Yogurt

Old-Fashioned Vanilla," vanilla beans and the vanilla flower.



4.      The unqualified, prominent and conspicuous representation as "Vanilla" is false, deceptive and misleading because the Product contains non-vanilla flavors which imitate and extend vanilla but are not derived from the vanilla bean, yet these flavors are not disclosed to consumers as required and expected.

I.      Vanilla is Constantly Subject to Efforts at Imitation Due to High Demand

5.      Among yogurt flavors, vanilla is a perennial favorite, and is the third-most preferred according to a recent survey by FONA International, a flavor company.[1]

6.      The tropical orchid of the genus Vanilla (*V. planifolia*) is the source of the prized flavor commonly known as vanilla, defined by law as "the total sapid and odorous principles extractable from one-unit weight of vanilla beans."[2]

7.      Vanilla's "desirable flavor attributes…make it one of the most common ingredients

---

[1] What's Next for Yogurt: A Global Review, FONA International
[2] 21 C.F.R. §169.3(c).

used in the global marketplace, whether as a primary flavor, as a component of another flavor, or for its desirable aroma qualities."[3]

8.     Though the Pure Food and Drugs Act of 1906 ("Pure Food Act") was enacted to "protect consumer health and prevent commercial fraud," this was but one episode in the perpetual struggle against those who have sought profit through sale of imitation and lower quality commodities, dressed up as the genuine articles.[4]

9.     It was evident that protecting consumers from fraudulent vanilla would be challenging, as E. M. Chace, Assistant Chief of the Foods Division of the U.S. Department of Agriculture's Bureau of Chemistry, noted "There is at least three times as much vanilla consumed [in the United States] as all other flavors together."[5]

10.     This demand could not be met by natural sources of vanilla, leading manufacturers to devise clever, deceptive and dangerous methods to imitate vanilla's flavor and appearance.

11.     Today, headlines tell a story of a resurgent global threat of "food fraud" – from olive oil made from cottonseeds to the horsemeat scandal in the European Union.[6]

12.     Though "food fraud" has no agreed-upon definition, its typologies encompass an ever-expanding, often overlapping range of techniques with one common goal: giving consumers less than what they bargained for.

---

[3] Daphna Havkin-Frenkel, F.C. Bellanger, Eds., Handbook of Vanilla Science and Technology, Wiley, 2018.

[4] Berenstein, 412; some of the earliest recorded examples of food fraud include unscrupulous Roman merchants who sweetened wine with lead.

[5] E. M. Chace, "The Manufacture of Flavoring Extracts," Yearbook of the United States Department of Agriculture 1908 (Washington, DC: Government Printing Office, 1909) pp.333–42, 333 quoted in Nadia Berenstein, "Making a global sensation: Vanilla flavor, synthetic chemistry, and the meanings of purity," History of Science 54.4 (2016): 399-424 at 399.

[6] Jenny Eagle, 'Today's complex, fragmented, global food supply chains have led to an increase in food fraud', FoodNavigator.com, Feb. 20, 2019; M. Dourado et al., Do we really know what's in our plate?. Annals of Medicine, 51(sup1), 179-179 (May 2019); Aline Wisniewski et al., "How to tackle food fraud in official food control authorities in Germany." Journal of Consumer Protection and Food Safety: 1-10. June 11, 2019.

A. Food Fraud as Applied to Vanilla

13.    Vanilla is considered a "high-risk [for food fraud] product because of the multiple market impact factors such as natural disasters in the source regions, unstable production, wide variability of quality and value of vanilla flavorings," second only to saffron in price.[7]

14.    The efforts at imitating vanilla offers a lens to the types of food fraud regularly employed across the spectrum of valuable commodities in today's interconnected world.[8]

| Type of Food Fraud | Application to Vanilla |
|---|---|
| ➢ Addition of markers specifically tested for instead of natural component of vanilla beans | • Manipulation of the carbon isotope ratios to produce synthetic vanillin with similar carbon isotope composition to natural vanilla |
| | • Ground vanilla beans and/or seeds to provide visual appeal as "specks" so consumer thinks the product contains real vanilla beans, when the ground beans have been exhausted of flavor |
| ➢ Appearance of *more* and/or higher quality of the valued ingredient | • Caramel to darken the color of an imitation vanilla so it more closely resembles the hue of real vanilla[9] |
| | • Annatto and turmeric extracts in dairy products purporting to be flavored with vanilla, which causes the color to better resemble the hue of rich, yellow butter |
| ➢ Substitution and replacement of a high quality ingredient with | • Tonka beans, though similar in appearance to vanilla beans, are banned from entry to the United States due to fraudulent use |

---

[7] Société Générale de Surveillance SA, ("SGS "), Authenticity Testing of Vanilla Flavors – Alignment Between Source Material, Claims and Regulation, May 2019.
[8] Kathleen Wybourn, DNV GL, Understanding Food Fraud and Mitigation Strategies, PowerPoint Presentation, Mar. 16, 2016.
[9] Renée Johnson, "Food fraud and economically motivated adulteration of food and food ingredients." Congressional Research Service R43358, January 10, 2014.

| | |
|---|---|
| alternate ingredient of lower quality | • Coumarin, a toxic phytochemical found in Tonka beans, added to imitation vanillas to increase vanilla flavor perception |
| ➢ Addition of less expensive substitute ingredient to mimic flavor of more valuable component | • Synthetically produced ethyl vanillin, from recycled paper, tree bark or coal tar, to imitate taste of real vanilla |
| ➢ Compounding, Diluting, Extending | • "to mix flavor materials together at a special ratio in which they [sic] compliment each other to give the desirable aroma and taste"[10]<br><br>• Combination with flavoring substances such as propenyl guaethol ("Vanitrope"), a "flavoring agent [, also] unconnected to vanilla beans or vanillin, but unmistakably producing the sensation of vanilla"[11]<br><br>• "Spiking" or "fortification" of vanilla through addition of natural and artificial flavors including vanillin, which simulates vanilla taste but obtained from tree bark |
| ➢ Addition of fillers to give the impression there is more of the product than there actually is | • Injection of vanilla beans with mercury, a poisonous substance, to raise the weight of vanilla beans, alleged in *International Flavors and Fragrances (IFF), Inc. v. Day Pitney LLP and Robert G. Rose,* 2005, Docket Number L-4486-09, Superior Court of New Jersey, Middlesex County |
| ➢ Ingredient List Deception[12] | • Subtle, yet deliberate misidentification and obfuscation of a product's components and qualities as they appear on the ingredient list |

---

[10] Chee-Teck Tan, "Physical Chemistry in Flavor Products Preparation: An Overview" in Flavor Technology, ACS Symposium Series, Vol. 610 1995. 1-17.

[11] Berenstein, 423.

[12] Recent example of this would be "evaporated cane juice" as a more healthful sounding term to consumers to identify sugar.

- o "ground vanilla beans" gives impression it describes unexhausted vanilla beans when actually it is devoid of flavor and used for aesthetics
- o "natural vanilla flavorings" – "-ing" as suffix referring to something *like* that which is described
- o "Vanilla With Other Natural Flavors" – implying – wrongly – such a product has a sufficient amount of vanilla to characterize the food
- o "Natural Flavors" – containing "natural vanillin" derived not from vanilla beans but from tree pulp. When paired with real vanilla, vanillin is required to be declared as an artificial flavor
- o "Non-Characterizing" flavors which are not identical to vanilla, but that extend vanilla

15.    The "plasticity of legal reasoning" with respect to food fraud epitomize what H. Mansfield Robinson and Cecil H. Cribb noted in 1895 in the context of Victorian England:

> the most striking feature of the latter-day sophisticator of foods is his knowledge of the law and his skill in evading it. If a legal limit on strength or quality be fixed for any substance (as in the case of spirits), he carefully brings his goods right down to it, and perhaps just so little below that no magistrate would convict him.

*The law and chemistry of food and drugs*. London: F.J. Rebman at p. 320.[13]

B.    The Use of Vanillin to Simulate Vanilla

16.    The most persistent challenger to the authenticity of real vanilla has been synthetic versions of its main flavor component, vanillin.

17.    First synthesized from non-vanilla sources by German chemists in the mid-1800s, vanillin was the equivalent of steroids for vanilla flavor.

---

[13] Cited in Sébastien Rioux, "Capitalist food production and the rise of legal adulteration: Regulating food standards in 19th-century Britain," Journal of Agrarian Change 19.1 (2019) at p. 65 (64-81).

18.    According to Skip Rosskam, a professor of vanilla at Penn State University and former head of the David Michael flavor house in Philadelphia, "one ounce of vanillin is equal to a full gallon of single-fold vanilla extract."[14]

19.    Today, only 1-2% of vanillin in commercial use is vanillin obtained from the vanilla plant, which means that almost all vanillin has no connection to the vanilla bean.

20.    Nevertheless, disclosure of this powerful ingredient has always been required where a product purports to be flavored with vanilla. *See* Kansas State Board of Health, Bulletin, Vol. 7, 1911, p. 168 (cautioning consumers that flavor combinations such as "vanilla and vanillin…vanilla flavor compound," etc., are not "vanilla [extract] no matter what claims, explanations or formulas are given on the label.").

21.    Since vanilla is the only flavor with its own standard of identity, its labeling is controlled not by the general flavor regulations but by the standards for vanilla ingredients.

22.    This means that if a product is represented as being characterized by vanilla yet contains non-vanilla vanillin, the label and packaging must declare vanillin an artificial flavor. *See* Vanilla-vanillin extract at 21 C.F.R. § 169.180(b) ("The specified name of the food is 'Vanilla-vanillin extract _-fold' or '_-fold vanilla-vanillin extract', followed immediately by the statement 'contains vanillin, an artificial flavor (or flavoring)'."); *see also* 21 C.F.R. § 169.181(b), § 169.182(b) (Vanilla-vanillin flavoring and Vanilla-vanillin powder).

23.    This prevents consumers from being misled by products which may taste similar to real vanilla and but for consumer protection requirements, would be sold at the price of real vanilla.

---

[14] Katy Severson, Imitation vs. Real Vanilla: Scientists Explain How Baking Affects Flavor, Huffington Post, May 21, 2019.

C.  Production of "Natural Vanillins" Combined with "Natural Vanilla"

24.   The past ten years have seen many vanillins purporting to be a "natural flavor" – derived from a natural source material which undergoes a natural production process.

25.   However, "natural vanillin" is not a "natural vanilla flavor" because the raw material is not vanilla beans but ferulic acid and eugenol.

26.   Ferulic acid can be converted to vanillin through a natural fermentation process which is cost prohibitive for almost all applications.

27.   Vanillin from eugenol is easier to produce in a way claimed to be a "natural process."

28.   However, because this process occurs without transparency or verification in China, regulators and consumers are not told the production method is more properly described as that of an artificial flavor, involving a chain of chemical reactions.

II.    Flavor Industry's Efforts to Use Less Vanilla, Regardless of any Shortages

29.   The "flavor industry" refers to the largest "flavor houses" such as Symrise AG, Firmenich, Givaudan, International Flavors and Fragrances (including David Michael), Frutarom and Takasago International along with the largest food manufacturing companies such as Unilever.

30.   The recent global shortage of vanilla beans has provided the flavor industry another opportunity to "innovate[ing] natural vanilla solutions…to protect our existing customers."[15]

31.   Their "customers" do not include the impoverished vanilla farmers nor consumers, who are sold products labeled as "vanilla" for the same or higher prices than when those products contained *only* vanilla.

32.   These efforts include (1) market disruption and manipulation and (2) the development of alternatives to vanilla which completely or partially replace vanilla.

---

[15] Amanda Del Buono, Ingredient Spotlight, Beverage Industry, Oct. 3, 2016.

A. Flavor Industry's Attempt to Disrupt Supply of Vanilla to Create a "Permanent Shortage"

33.    The flavor industry has developed schemes such as the "Sustainable Vanilla Initiative" and "Rainforest Alliance Certified," to supposedly assure a significant supply of vanilla at stable, reasonable prices.

34.    Contrary to their intention, these programs make vanilla less "sustainable" by paying farmers to destroy their vanilla and harvest palm oil under the pretense of "crop diversification."

35.    There have also been allegations that these programs use child and/or slave labor.

36.    Other tactics alleged to be utilized by these companies include "phantom bidding," where saboteurs claim they will pay a higher price to small producers, only to leave the farmers in the lurch, forced to sell at bottom dollar to remaining bidders.[16]

37.    The reasons for these counterintuitive actions is because they benefit from high vanilla prices and the use of less real vanilla.

38.    When less vanilla is available, companies must purchase the higher margin, proprietary, "vanilla-like" flavorings made with advanced technology and synthetic biology.

B. Use of Vanilla WONF or Compounded Ingredients to Replace Vanilla

39.    According to Suzanne Johnson, vice president or research at a North Carolina laboratory, "Many companies are trying to switch to natural vanilla with other natural flavors [WONF] in order to keep a high-quality taste at a lower price," known as "Vanilla WONF."

40.    The head of "taste solutions" at Irish conglomerate Kerry urged flavor manufacturers to "[G]et creative" and "build a compounded vanilla flavor with other natural flavors."

41.    A compounded vanilla flavor "that matches the taste of pure vanilla natural extracts" can supposedly "provide the same vanilla taste expectation while requiring a smaller quantity of

---

[16] Monte Reel, The Volatile Economics of Natural Vanilla in Madagascar, Bloomberg.com, Dec. 16, 2019.

vanilla beans. The result is a greater consistency in pricing, availability and quality."[17]

42.     These compounded flavors exist in a "black box" with "as many as 100 or more flavor ingredients," including potentiators and enhancers, like maltol and piperonal, blended together to enhance the vanilla, allowing the use of less vanilla to achieve the intended taste.[18]

43.     The effort to replace vanilla with so-called Vanilla WONF started in the late 1960s, but the last 10 years have seen the proliferation of this ingredient.

### C.  Decline of Industry Self-Governance

44.     That high level executives in the flavor industry are willing to boast of their stratagems to give consumers less vanilla for the same or greater price is not unexpected.

45.     The once powerful and respected trade group, The Flavor and Extract Manufacturers Association ("FEMA"), abandoned its "self-policing" of misleading vanilla labeling claims and disbanding its Vanilla Committee.

46.     FEMA previously opposed industry efforts to deceive consumers, but cast the public to the curb in pursuit of membership dues from its largest members, such as Unilever.

## III.     Representations are Misleading

### A.  Deceptive Placement of Statement of Identity Off the Principal Display Panel

47.     The Product's principal display panel ("PDP" or "front label") is "the part of a label that is most likely to be displayed, presented, shown, or examined under customary conditions of display for retail sale" and must "accommodate all the mandatory label information required to be placed thereon by this part with clarity and conspicuousness and without obscuring design,

---

[17] Donna Berry, Understanding the limitations of natural flavors, BakingBusiness.com, Jan. 16, 2018.
[18] Hallagan and Drake, FEMA GRAS and U.S. Regulatory Authority: U.S. Flavor and Food Labeling Implications, Perfumer & Flavorist, Oct. 25, 2018; Charles Zapsalis et al., *Food chemistry and nutritional biochemistry*. Wiley, 1985, p. 611 (describing the flavor industry's goal to develop vanilla compound flavors "That *Seem*[s] to be Authentic or at Least Derived from a Natural Source") (emphasis added).

vignettes, or crowding." *See* 21 C.F.R. § 101.1.

48.    The front label of a lowfat yogurt is required to contain "[T]he full name of the food…in type of uniform size, style, and color…accompanied by a declaration indicating the presence of any characterizing flavoring as specified in 101.22 of this chapter." *See* 21 C.F.R. § 131.203(f) ("Nomenclature.").

49.    The "mandatory label information" includes the "net quantity of contents" and "statement of identity." *See* 21 C.F.R. § 101.7(a) ("Declaration of net quantity of contents.") and 21 C.F.R. § 101.3(a) ("Identity labeling of food in packaged form.").

50.    Though the Product's statement of identity purports to be "(old-fashioned) vanilla lowfat yogurt," this is not the name "specified in or required by any applicable Federal law or regulation." *See* 21 C.F.R. § 101.3(b)(1); *see also* 21 C.F.R. § 101.22(i)(1) (where the food "contains no artificial flavor which simulates, resembles or reinforces the characterizing flavor, the name of the food on the principal display panel or panels of the label shall be accompanied by the common or usual name of the characterizing flavor, e.g., 'vanilla'").

51.    The actual name of the Product is not conspicuous to consumers as it is intentionally placed off the outer edge of the front label.



52.    The statement of identity is required on the front yet not prominently and conspicuously placed, rendering it unlikely to be read by the ordinary individual under customary conditions of purchase.  *See* 21 U.S.C. § 343(f).

IV.    Products Contain Non-Vanilla Ingredients

53.    The Product's ingredient list identifies "Natural Flavor" and "Vanilla Beans" as ingredients typically used to provide flavor.

Ingredient List

**INGREDIENTS:** PASTEURIZED NONFAT MILK AND CREAM, WATER, SUGAR, NATURAL FLAVOR, CORNSTARCH, GUAR GUM, VANILLA BEANS, CITRIC ACID, ANNATTO (COLOR), TURMERIC (COLOR), LIVE ACTIVE CULTURES (S. THERMOPHILUS, BIFIDOBACTERIUM SP., B. LACTIS, L. ACIDOPHILUS, L. CASEI, L. RHAMNOSUS, L. LACTIS, L. BULGARICUS).

**INGREDIENTS:** PASTEURIZED NONFAT MILK AND CREAM, WATER, SUGAR, NATURAL FLAVOR, CORNSTARCH, GUAR GUM, VANILLA BEANS, CITRIC ACID, ANNATTO (COLOR), TURMERIC (COLOR), LIVE ACTIVE CULTURES (S. THERMOPHILUS, BIFIDOBACTERIUM SP., B. LACTIS, L. ACIDOPHILUS, L. CASEI, L. RHAMNOSUS, L. LACTIS, L. BULGARICUS).

54.    The declaration of "Natural Flavor" means this does not refer to an exclusively vanilla ingredient, which would be listed on the ingredient list by its common or usual name provided by its standard of identity. *See* 21 C.F.R. § 169.175(b)(1) ("The specified name of the food is 'Vanilla extract' or 'Extract of vanilla'."); *see also* 21 C.F.R. § 169.177(b) ("The specified name of the food is 'Vanilla flavoring.'").

55.    In fact, it has been confirmed that the "Natural Flavor" includes "Natural Vanilla Flavor" and separate "Natural Flavor."

56.    Within the past two years, the ingredient list contained the multi-component ingredient identified as "Vanilla Blend" consisting of "water, sugar, natural vanilla flavor, natural

12

flavor, corn starch, guar gum, vanilla bean, citric acid, annatto (color) and turmeric (color)."

57.    The present ingredient list contains the same components of the vanilla blend but they have been properly dispersed into the ingredient list in order of predominance by weight.

58.    That the components of the vanilla blend and those in the present version of the Products are identical can be and/or has been confirmed by analysis of the compounds and ratios.

A.    "Vanilla Beans" in Product are Spent Beans for Decoration

59.    The Product's ingredient list declares "vanilla beans" which is misleading and deceptive, and gives consumers the false impression the Product contains more vanilla than it does.

60.    This is because these beans are exhausted, spent vanilla beans as opposed to unexhausted beans not yet subject to extraction.

61.    If the vanilla beans were not already exhausted, the analysis performed on the Products would reveal levels of vanilla marker compounds which are not present.

B.    "Yogurt With Other Natural Flavors" is Misleading

62.    The Product's name, "Lowfat Greek Yogurt With Other Natural Flavors" is an inaccurate and misleading statement of identity.

63.    The term "With Other Natural Flavors" is intended for a situation where a "food contains both a characterizing flavor from the product whose flavor is simulated and *other natural flavor* which simulates, resembles or reinforces the characterizing flavor." *See* 21 C.F.R. § 101.22(i)(1)(iii) (emphasis added).

64.    Since the Product purports to contain characterizing flavor from vanilla beans, the "Other Natural Flavor" are not derived from vanilla, yet simulate, resemble or reinforce vanilla. *See* 21 C.F.R. § 101.22(i)(1)(iii).

65.    If the amount of the characterizing vanilla flavor is sufficient to independently

characterize the Product, the statement of identity would be "[Vanilla] With Other Natural Flavor." *See* 21 C.F.R. § 101.22(i)(1)(iii); *see also* 21 C.F.R. § 101.22(i)(1) ("introductory text" describing scenario where food contains "no artificial flavor which simulates, resembles or reinforces the characterizing flavor," and none of the sub-paragraphs of 21 C.F.R. § 101.22(i)(1) apply).

66.    If the amount of the characterizing vanilla flavor is insufficient to independently characterize the food, the statement of identity would be "[Vanilla] Flavored With Other Natural Flavor." *See* 21 C.F.R. § 101.22(i)(1)(iii) referring to "paragraph (i)(1)(i) of this section"; *see also* 21 C.F.R. § 101.22(i)(1)(i).

67.    Because "With Other Natural Flavors" is not preceded by "Vanilla" or "Vanilla Flavored," the Product is tacitly disclaiming having any real vanilla.

68.    Defendant's vanilla statements and representations are deceptive to consumers in light of its admission the Product lacks vanilla.

C.    <u>Even With "Vanilla" or "Vanilla Flavored" Preceding "With Other Natural Flavors," Products' Representations Remain Misleading</u>

69.    If the Product intended to write "vanilla" or "vanilla flavored" before "With Other Natural Flavors," the representations are still misleading.

70.    By adding "Other Natural Flavors" to a standardized exclusively vanilla ingredient – vanilla extract or vanilla flavoring – consumers are not receiving the same high quality and expensive ingredient and are unaccustomed to such a pairing.

71.    Consumers are deceived because such representations fail to specify how much of the "Vanilla With Other Natural Flavors" is from vanilla vis-à-vis non-vanilla natural flavors. Exhibit A, Letter from FDA to Ernie Molina, Warner-Jenkinson Company of California, January 17, 1980 ("the general principles of 21 CFR 102.5 should apply" and proportions of each component should be disclosed, i.e., "contains 50% vanilla extract and 50% non-vanilla flavors"

or otherwise disclose the proportions.).

D. "Vanilla With Other Natural Flavors" Containing "Natural Vanillin" Falsely Implies a Natural Vanilla Flavor

72.    To the extent the "Other Natural Flavors" contain vanillin from a natural source and made through a natural process, yet not derived from vanilla, it is misleading to represent the Products as "With Other Natural Flavors," "Vanilla With Other Natural Flavors" and "Vanilla Flavored With Other Natural Flavors."

73.    This is because the "standards of identity for vanilla extract (21 CFR 169.175) and vanilla flavoring (21 CFR 169.177) do not provide for the use of vanillin," such that even "natural vanillin" may not "be used to make natural vanilla flavors."  Exhibit B, FDA Letter, Ferre-Hockensmith to Richard Brownell, Jr., April 19, 2005, pp. 1-2; *see* 21 C.F.R. § 169.175(a)(1)-(5) (listing glycerin, propylene glycol, sugar, dextrose and corn sirup as only optional ingredients for vanilla extract).

74.    Vanillin *may* be added to vanilla extract but the ingredient list must say "contains vanillin, an artificial flavor (or flavoring)."  *See* Vanilla-vanillin extract at 21 C.F.R. § 169.180(b) ("The specified name of the food is 'Vanilla-vanillin extract _-fold' or '_-fold vanilla-vanillin extract', followed immediately by the statement 'contains vanillin, an artificial flavor (or flavoring)'.").

75.    Even if the vanillin is produced through a natural process, the front label statements and images imply the Product's flavor "is a 'natural vanilla flavor'" even though naturally produced vanillin "is not derived from vanilla beans.  Exhibit C, FDA Letter, Ferre-Hockensmith to Richard Brownell, Jr., August 5, 2008, p. 2.

76.    Naturally produced vanillin may be designated as "'natural flavor' or 'contains natural flavor'" in the context of the general flavor regulations at 21 C.F.R. § 101.22.  Exhibit C,

FDA Letter, Ferre-Hockensmith to Richard Brownell, Jr., August 5, 2008, p. 2.

77.    However, adding any type or amount of vanillin to a vanilla extract or vanilla flavoring and implying the Product contains a "natural vanilla flavor" is misleading to consumers and in violation of law.

78.    If naturally produced vanillin were added separately to another finished food, it would be listed in the ingredients as "'vanillin' or 'natural flavor' but it should not be done in a way to imply that it is a 'natural vanilla flavor' because it is not derived from vanilla beans." Exhibit D, FDA Letter, Negash Belay to Agneta Weisz, October 10, 2008.

79.    Adding naturally produced vanillin to a real vanilla flavor like vanilla extract, coupled with statements and images of vanilla deceives consumers to think the vanilla taste is from vanilla beans.

80.    The FDA's guidance on labeling naturally derived vanillin allows for it to be labeled a "natural flavor" only outside the context of the standardized vanilla ingredients "under sections 169.180, 169.181, and 169.182 in 21 CFR." Exhibit C, FDA Letter, Ferre-Hockensmith to Richard Brownell, Jr., August 5, 2008, p. 2.

E.    "Natural Flavor" on Ingredient List Does Not Refer to Only Vanilla

81.    Even though the Product's front label indicates an unqualified "Vanilla," vanilla is a miniscule part of the "Natural Flavor." *See* 21 C.F.R. § 101.22(h)(1) ("Spice, natural flavor, and artificial flavor may be declared as 'spice', 'natural flavor', or 'artificial flavor', or any combination thereof, as the case may be.").

82.    The non-vanilla flavors include piperonal and maltol, which are not chemically identical to, nor taste similar to vanilla, but potentiate, enhance and extend vanilla.

83.    These "WONF" flavors "simulate[s], resemble[s] or reinforce[s] the characterizing

flavor" of vanilla and are required to be disclosed on the front label. *See* 21 C.F.R. § 101.22(i)(1)(iii).

84.   The absence of any explanatory terms on the front label is misleading because consumers are entitled to expect the Product's most valuable "real estate" will be safe instead of filled with the equivalent of sinkholes and booby traps for those who have not devoted countless hours to these issues.

F.   Even if Non-Vanilla Flavors are "Non-Characterizing," They Extend the Vanilla and Must Be Disclosed on Front Label

85.   A common justification for failing to declare non-vanilla flavors on the front label is by describing them as "non-characterizing" for vanilla.

86.   This novel "food fraud" effort was devised by David Michael & Co., Inc., currently part of International Flavors & Fragrances ("IFF"), with development of the *Vanguard* "flavoring system" for vanilla products in the late 1970s.[19]

87.   *Vanguard* was described as a "flavorless" "natural flavor enhancer" that "contain[ed] no vanilla, vanillin, ethyl vanillin, or any artificial flavor."

88.   *Vanguard* consisted of "blend[s] of dozens of plant extractives, roots, and botanicals, all natural ingredients found on the GRAS list."

89.   David Michael touted this ingredient as a "vanilla replacer," able to reduce the amount of vanilla by half yet not have to modify the front label and have no effect on the product.

90.   Several years later, the FDA rebuked this attempt at undermining food standards.

91.   It is deceptive and misleading for the Products to avoid declaring their non-vanilla flavors merely because they may not simulate, or are not chemically identical to vanilla.

---

[19] Developed initially for use in ice cream but expanded to other foods.

92.     Use of this narrow criteria fails to recognize that the added flavors resemble, reinforce and extend the characterizing vanilla flavor, even though they do not taste identical.

93.     Defendant knows consumers will pay more for the Products because their label does not state "flavored" or "flavors," which is understood to mean its flavor is only from vanilla.

G.     The Products' Non-Vanilla Flavors do Not Fulfill Other Roles Which Could Exempt Them From Front Label

94.     Non-flavor purposes of flavors include (1) increasing sweetness without adding caloric sweeteners, (2) masking non-desirable off-flavors caused by other ingredients and (3) "rounding out" other notes and ancillary flavors.

95.     Examples of ingredients which are known to require "masking flavors" are non-caloric sweeteners like Stevia ("bitter notes most often described as a licorice off-taste") and pea proteins ("grassy, beany, earthy, bitter and chalky").[20]

96.     Masking flavors are claimed to work "in the background with the characterizing notes, elevating them to their true potential" and "subdu[ing] off flavors from other ingredients…allowing the characterizing flavor to shine."[21]

97.     Therefore, the masking flavors in the Products are relevant to their front label flavor designation.  *See* 21 C.F.R. § 101.22(i)(1)(iii) (describing how "other natural flavor which simulates, resembles or reinforces the characterizing flavor" is required to be disclosed).

98.     Describing a flavor as "rounding out" another flavor is a legitimate-sounding yet often meaningless rationale for excluding such flavor from the front label.

99.     "Rounding out" is an amorphous concept used to refer to one flavor's ability to

---

[20] Robby Gardner, Last Bite: Flavor-Masking Stevia, May 24, 2011, Nutritional Outlook; Jeff Gelski, Eliminating the pea flavor in pea protein, February 21, 2018, Food Business News.
[21] Donna Berry, Modifying Flavor in Dairy Foods, April 11, 2018, Food Business News.

enhance a food's characterizing flavor, which meets the criteria for being part of the flavor designation.[22]

V.    Conclusion

100.  Defendant's branding and packaging of the Product is designed to – and does – deceive, mislead, and defraud consumers.

101.  Defendant has sold more of the Products and at higher prices per unit than it would have in the absence of this misconduct, resulting in additional profits at the expense of consumers.

102.  The amount and proportion of the characterizing component, vanilla, has a material bearing on price or consumer acceptance of the Products because consumers are willing to pay more for such Products.

103.  The value of the Product that plaintiff purchased and consumed was materially less than its value as represented by defendant.

104.  Had plaintiff and class members known the truth, they would not have bought the Products or would have paid less for it.

105.  The Product contains other representations which are misleading and deceptive.

106.  As a result of the false and misleading labeling, the Product is sold at a premium price, approximately no less than $3.89 per 5.3 OZ, excluding tax, compared to other similar products represented in a non-misleading way.

<u>Jurisdiction and Venue</u>

107.  Jurisdiction is proper pursuant to 28 U.S.C. § 1332(d)(2) (Class Action Fairness Act

---

[22] *See* <u>Butter's Got Cheese's Back: Part One</u>, October 17, 2014, Edlong.com 1.   ("Our dairy expertise has shown us that butter flavor complements processed and cheddar cheese profiles by rounding out the named profile and adding a more fatty taste.").

of 2005 or "CAFA").

108.   Under CAFA, district courts have "original federal jurisdiction over class actions involving (1) an aggregate amount in controversy of at least $5,000,000; and (2) minimal diversity[.]" *Gold v. New York Life Ins. Co.*, 730 F.3d 137, 141 (2d Cir. 2013).

109.   Upon information and belief, the aggregate amount in controversy is more than $5,000,000.00, exclusive of interests and costs.

110.   This is a reasonable assumption because defendant's Products are sold in thousands of stores across the country and have been sold bearing the allegedly misleading claims for at least three years.

111.   Plaintiff is a citizen of New York.

112.   Defendant is a Oregon cooperative with a principal place of business in Tillamook, Tillamook County, Oregon and is a citizen of Oregon.

113.   This court has personal jurisdiction over defendant because it conducts and transacts business, contracts to provide and/or supply and provides and/or supplies services and/or goods within New York.

114.   Venue is proper because plaintiff and many class members reside in this District and defendant does business in this District and State.

115.   A substantial part of events and omissions giving rise to the claims occurred in this District.

<u>Parties</u>

116.   Plaintiff is a citizen of New York, New York County, New York.

117.   Defendant Tillamook County Creamery Association is a Oregon cooperative with a principal place of business in Tillamook, Oregon, Tillamook County.

118.   During the relevant statutes of limitations, plaintiff purchased, used or consumed the

Product within this district and/or State for personal consumption in reliance on the representations.

Class Allegations

119.   The classes will consist of all purchasers of the Products in New York, the other 49 states and a nationwide class, during the applicable statutes of limitations.

120.   Common questions of law or fact predominate and include whether defendant's representations were and are misleading and if plaintiff and class members are entitled to damages.

121.   Plaintiff's claims and basis for relief are typical to other members because all were subjected to the same unfair and deceptive representations and actions.

122.   Plaintiff is an adequate representative because her interests do not conflict with other members.

123.   No individual inquiry is necessary since the focus is only on defendant's practices and the class is definable and ascertainable.

124.   Individual actions would risk inconsistent results, be repetitive and are impractical to justify, as the claims are modest relative to the scope of the harm.

125.   Plaintiff's counsel is competent and experienced in complex class action litigation and intends to adequately and fairly protect class members' interests.

126.   Plaintiff seeks class-wide injunctive relief because the practices continue.

New York GBL §§ 349 & 350
(Consumer Protection from Deceptive Acts)

127.   Plaintiff incorporates by reference all preceding paragraphs.

128.   Plaintiff and class members desired to purchase, consume and use products or services which were as described and marketed by defendant and expected by reasonable consumers, given the product or service type.

129.  Defendant's acts and omissions are not unique to the parties and have a broader impact on the public.

130.  Defendant misrepresented the substantive, quality, compositional, organoleptic and/or nutritional attributes of the Products.

131.  Defendant's conduct was misleading, deceptive, unlawful, fraudulent, and unfair because it gives the impression to consumers the Products contain sufficient amounts of the highlighted ingredient, vanilla, to independently characterize the taste or flavor of the Products, did not contain other flavor components which simulate, resemble or reinforce the characterizing flavor and only contained flavor from vanilla.

132.  Plaintiff and class members would not have purchased the Products or paid as much if the true facts had been known, suffering damages.

<u>Negligent Misrepresentation</u>

133.  Plaintiff incorporates by reference all preceding paragraphs.

134.  Defendant misrepresented the substantive, quality, compositional, organoleptic and/or nutritional attributes of the Products.

135.  Defendant's conduct was misleading, deceptive, unlawful, fraudulent, and unfair because it gives the impression to consumers the Products contain sufficient amounts of the highlighted ingredient, vanilla, to independently characterize the taste or flavor of the Products, did not contain other flavor components which simulate, resemble or reinforce the characterizing flavor and only contained flavor from vanilla.

136.  Defendant had a duty to disclose and/or provide non-deceptive marketing of the Products and knew or should have known same were false or misleading.

137.  This duty is based on defendant's position as an entity which has held itself out as

having special knowledge and experience in the production, service and/or sale of the product or service type.

138.  The representations took advantage of consumers' (1) cognitive shortcuts made at the point-of-sale and (2) trust placed in defendant, a well-known and respected brand in this sector.

139.  Plaintiff and class members reasonably and justifiably relied on these negligent misrepresentations and omissions, which served to induce and did induce, the purchase of the Products.

140.  Plaintiff and class members would not have purchased the Product or paid as much if the true facts had been known, suffering damages.

<u>Breaches of Express Warranty, Implied Warranty of Merchantability and<br>Magnuson Moss Warranty Act, 15 U.S.C. §§ 2301, *et seq.*</u>

141.  Plaintiff incorporates by reference all preceding paragraphs.

142.  The Products were manufactured, labeled and sold by defendant and warranted to plaintiff and class members that they possessed substantive, functional, nutritional, qualitative, compositional, organoleptic, sensory, physical and other attributes which they did not.

143.  Defendant had a duty to disclose and/or provide non-deceptive descriptions and marketing of the Products.

144.  This duty is based, in part, on defendant's position as one of the most recognized companies in the nation in this sector.

145.  Plaintiff provided or will provide notice to defendant, its agents, representatives, retailers and their employees.

146.  Defendant received notice and should have been aware of these misrepresentations due to numerous complaints by consumers to its main office over the past several years.

147.  The Products did not conform to their affirmations of fact and promises due to

defendant's actions and were not merchantable.

148.  Plaintiff and class members would not have purchased the Products or paid as much if the true facts had been known, suffering damages.

Fraud

149.  Plaintiff incorporates by references all preceding paragraphs.

150.  Defendant's conduct was misleading, deceptive, unlawful, fraudulent, and unfair because it gives the impression to consumers the Products contain sufficient amounts of the highlighted ingredient, vanilla, to independently characterize the taste or flavor of the Products, did not contain other flavor components which simulate, resemble or reinforce the characterizing flavor and only contained flavor from vanilla.

151.  Defendant's fraudulent intent is evinced by its failure to accurately identify the Products on the front label when it knew this was not true.

152.  Plaintiff and class members would not have purchased the Products or paid as much if the true facts had been known, suffering damages.

Unjust Enrichment

153.  Plaintiff incorporates by reference all preceding paragraphs.

154.  Defendant obtained benefits and monies because the Products were not as represented and expected, to the detriment and impoverishment of plaintiff and class members, who seek restitution and disgorgement of inequitably obtained profits.

Jury Demand and Prayer for Relief

Plaintiff demands a jury trial on all issues.

   **WHEREFORE**, Plaintiff prays for judgment:

1.  Declaring this a proper class action, certifying Plaintiff as representative and undersigned

as counsel for the class;

2. Entering preliminary and permanent injunctive relief by directing defendant to correct the challenged practices to comply with the law;

3. Injunctive relief to remove, correct and/or refrain from the challenged practices and representations, restitution and disgorgement for members of the State Subclasses pursuant to the applicable laws of their States;

4. Awarding monetary damages and interest, including treble and punitive damages, pursuant to the common law and other statutory claims;

5. Awarding costs and expenses, including reasonable fees for plaintiff's attorneys and experts; and

6. Other and further relief as the Court deems just and proper.

Dated:   February 28, 2020

Respectfully submitted,

Sheehan & Associates, P.C.
/s/Spencer Sheehan
Spencer Sheehan
505 Northern Blvd Ste 311
Great Neck NY 11021-5101
Tel: (516) 303-0552
Fax: (516) 234-7800
*spencer@spencersheehan.com*
E.D.N.Y. # SS-8533
S.D.N.Y. # SS-2056

Reese LLP
Michael R. Reese
100 W 93rd St Fl 16
New York NY 10025-7524
Telephone: (212) 643-0500
Fax: (212) 253-4272
*mreese@reesellp.com*

1:20-cv-01764
United States District Court
Southern District of New York

Maritza Angeles, individually and on behalf of all others similarly situated,

Plaintiff,

- against -

Tillamook County Creamery Association,

Defendant

## Class Action Complaint

```
Sheehan & Associates, P.C.
505 Northern Blvd Ste 311
Great Neck NY 11021-5101
   Tel: (516) 303-0552
   Fax: (516) 234-7800
```

Pursuant to 22 NYCRR 130-1.1, the undersigned, an attorney admitted to practice in the courts of New York State, certifies that, upon information, and belief, formed after an inquiry reasonable under the circumstances, the contentions contained in the annexed documents are not frivolous.

Dated:  February 28, 2020

/s/ Spencer Sheehan
Spencer Sheehan